## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,

      Plaintiff,

      v.

Divaunte Kartrell Young,

      Defendant.

Case No. 23-cr-208 (MJD/ECW)

**ORDER AND**
**REPORT & RECOMMENDATION**

This case is before the Court on Defendant Divaunte Kartrell Young's Motion to Suppress Witness Statements Pursuant to the Fifth Amendment (Dkt. 17); Defendant Divaunte Kartrell Young's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Dkt. 18); Defendant Divaunte Kartrell Young's Motion to Require Government to Permit Defense Inspection of Defendant's Cellphone (Dkt. 19); and Defendant Divaunte Kartrell Young's Motion to Dismiss the Indictment (Dkt. 35).

On December 7, 2023, the Court held a previously continued (Dkt. 26) hearing on the pretrial motions. Ruth Shnider, Assistant U.S. Attorney, appeared on behalf of the Government, and Robert Paule appeared on behalf of Defendant Divaunte Kartrell Young ("Young"), who was present at the hearing. The parties requested post-hearing briefing, which was competed on February 2, 2024.

Subsequently, Young filed two pro se motions (Dkts. 48 and 50), which should be denied because he is represented by legal counsel. *See United States v. Green*, No. 19CR103 (MJD/ECW) (3), 2020 WL 5652476, at *8 (D. Minn. Sept. 23, 2020), *aff'd*,

2020 WL 6337705 (D. Minn. Oct. 29, 2020) ("It has long been Eighth Circuit policy 'that when a party is represented by counsel, we will not accept pro se briefs for filing.'") (quoting *United States v. Hunter*, No. CR 12-185(3) ADM/FLN, 2016 WL 6915506, at *3 (D. Minn. Nov. 22, 2016), quoting *United States v. Hunter*, 770 F.3d 740, 746 (8th Cir. 2014), quoting *United States v. Payton*, 918 F.2d 54, 56 n.2 (8th Cir. 1990)). Similarly, the Court will not consider Young's pro se submissions, received by the Court on February 16 and 23, 2024, in support of his motions to suppress and his additional Requests to the Court from the Defense (Dkts. 52, 53, 54) should be denied on the same basis.

## I.     PROCEDURAL BACKGROUND

Young is charged by Indictment with a count of Felon in Possession of Firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8).  (Dkt. 1.)  The Indictment alleges that Young knowingly possessed a firearm on or about March 19, 2023, and has at least two qualifying convictions involving assaults, one conviction for second degree aggravated robbery, and another for first degree burglary.  (Dkt. 1.)  Young seeks relief by way of his Motion to Suppress Witness Statements Pursuant to the Fifth Amendment (Dkt. 17); Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Dkt. 18); Motion to Require Government to Permit Defense Inspection of Defendant's Cellphone (Dkt. 19); and Motion to Dismiss the Indictment (Dkt. 35).  The Court will address these motions below.

## II.   FACTUAL BACKGROUND

During the December 7, 2023 hearing, Jack Peterson, a police officer with the City of Rochester Police Department, testified that at approximately 2:30 a.m. on March 19, 2023, he was dispatched to an area in northeast Rochester as the result of a 911 call by a female regarding an unwanted male in her vehicle who had shown her a firearm. (Transcript of December 7, 2023 Hearing (Dkt. 41) ("R.") at 12-13, 24.)  Officer Peterson relied on the information provided by dispatch initially and had no information at that time regarding the identity of the male.  (R. 24-25.)  The caller, A.H., told the 911 dispatcher that she had picked up a male a few hours earlier that she did not really know, who had asked her for a ride to the cities in exchange for money, but that it was getting late and when she told him that she did not want to give him a ride to the cities, the man became more aggressive; that he had a gun on his person and he would not leave her car; that she had to leave her car with the keys; and that she did not know if the person was still in her vehicle.  (Gov't Ex. 4 at 00:00-7:50; *see also* R. 44-45.)  She also provided an estimated location of the vehicle with a description of the vehicle as a red Subaru Legacy. (Gov't Ex. 4 at 4:58-5:50, 6:50-7:00.)

Officer Peterson and a number of other officers were sent to the area identified by A.H. to look for the red Subaru Legacy.  (R. 13, 25, 28.)  Officers also knew the license plate of the vehicle.  (R. 25.)  Officers ultimately located a red Subaru matching the caller's description in the general area where caller claimed she had left the vehicle.  (R. 13-14, 15.)  It was located approximately one to two blocks from where the caller reported leaving the vehicle.  (R. 25.)  Officer Peterson testified that when they initially

came upon the vehicle, one of the officers reported seeing an occupant in the front passenger's seat of the vehicle. (R. 14.) The officer body cameras show one of the officers approaching from behind the vehicle. (Gov't Ex. 1 at 00:37-48). Officer McGuire's body camera showed him approaching the vehicle and looking inside with his flashlight. (Gov't Ex. 2 at 00:32-1:04.) Officer McGuire told Officer Peterson that he was unable to confirm anything about the identity of the person that he saw in the car. (R. 36-37.)

Officer Peterson then called A.H. to gather additional information. (R. 14-15.) Officer Peterson noted that the male was asleep in the vehicle and that police would be calling him out in a moment, and asked her if the suspect had a firearm and whether he had pointed it at her. (Gov't Ex. 1 at 2:08-18.) A.H. responded that the person had a handgun in an Adidas fanny pack around his chest; he did not point the gun at her; and the suspect had asked A.H. "what if I shot you" (later clarifying that the person asked what if he shot her in the head), but then downplayed it as joke, nonetheless scaring her. (*Id.* at 2:18-3:40.) A.H. later stated that the suspect did not make a threat of directly shooting her person. (*Id.* at 6:17-27.) She did see the gun and was uncomfortable with the male being in the car with the gun. (*Id.* at 6:27-36.) A.H. reported that he was "joking," saying if she did not take him to the cities, he would pull out the gun and blow up something in her vehicle. (*Id.* at 6:00-6:17.) A.H. had the keys to the Subaru. (*Id.* at 3:31-50.) A.H. noted that the suspect did not try to steal the vehicle and did not do anything overtly criminal. (*Id.* at 3:50-4:13.) A.H. claimed that she did "not really" know who the suspect was, but knew that his SnapChat name was "Tay Wild." (*Id.* at

4:13-38; R. 32.)  Officer Peterson testified that he typed that name into a local law enforcement database, and a number of names came up, but only one exactly matched the full nickname of Tay Wild—Divaunte Young.  (R. 15-16, 32-33.)

A.H. described the suspect as a shorter black male (5'9 or 5'10'), and confirmed upon questioning from Officer Peterson that the suspect had dreadlocks, as Officer Peterson was looking at photographs of individuals on his computer database.  (Gov't Ex. 1 at 4:38-5:29; R. 34.)  Officer Peterson testified that the information provided by A.H. was consistent with what he was seeing on the law enforcement database.  (R. 16.) Officer Peterson told A.H. that he might know who she was talking about based on his access to the police database.  (Gov't Ex. 1 at 5:26-33.)  He testified at the hearing that he was "fairly certain" it was Young, but did tell A.H. who he thought the suspect was because it was not A.H.'s business at that point, until it was "100 percent confirmed." (R. 34-35.)  A.H. claimed to officers that she had told the suspect that she wanted him out of the vehicle, and kept telling him to get out of the vehicle and asking him why he could not find somewhere in Rochester to stay, as opposed to needing to go to the cities. (Gov't Ex. 1 at 6:50-7:10.)

Officer Peterson copied Divaunte Young's driver's license number from his local files into the system to see if Young had any prior calls or outstanding warrants, and discovered that Young had an outstanding felony warrant.  (R. 17.)  Officer Peterson testified that even without the outstanding warrant, he believed that the suspect had committed the crime of terroristic threats, causing an individual to fear for their life or fear the threat of violence.  (R. 18.)  He also testified that at this point he believed that the

person in the vehicle was Young based on the social media name and the matching description of the individual.  (R. 17-18.)  Officer Peterson told the officers that he had a possible identification of the person in the vehicle as Divaunte Young and that Young had an outstanding felony warrant for his arrest.  (Gov't Ex. 1 at 7:10-50.)

The plan was to the separate the suspect from the vehicle, given the presence of a firearm, and arrest him.  (R. 17-18.)  Police repeatedly ordered the suspect in the passenger seat out of the vehicle and notified him that he was under arrest without using any name.  (Gov't Ex. 1 at 8:36-10:45.)  Police then stated on loudspeaker, "Divaunte I need you to move the driver's seat and exit the vehicle, right now" and "Divaunte you are under arrest."  (Gov't Ex. 1 at 10:00-23.)  Eventually, the suspect was placed into custody.  (Gov't Ex. 1 at 10:45-11:46.)

As he was walking towards officers, the suspect was told to get on his knees and was told that he was under arrest.  (Gov't Ex. 2 at 11:00-11:13.)  Just after he was told he was under arrest, the suspect volunteered "I got a felony warrant, right?"  (Gov't Ex. 2 at 11:13-37.)  Officer Peterson testified that the suspect looked like the Divaunte Young on his computer screen.  (R. 21.)

Officer Peterson then confirmed there was a felony warrant on Divante Young. (Gov't Ex. 1 at 13:46-50.)

Officer Peterson and Officer McGuire then searched the vehicle and found the firearm inside an Adidas fanny pack inside the red Subaru.  (Govt' Ex. 1 at 11:46 12:39; Gov't Ex. 2 12:06-12:46; R. 39-40.)  Marijuana was also found in the vehicle.  (R. 41.)

A.H. was interviewed by the police after Young's arrest.  (R. 40.)  She was hesitant when talking to police.  (R. 41-42.)  Officer Peterson testified that he tried to be friendly to her and told her that he was not "entirely too concerned about the narcotics" found inside the vehicle.  (R. 43.)  A.H. admitted to smoking some weed.  (R. 43.)  She asked if she was in trouble, and he responded that she was not in trouble.  (Gov't Ex. 3 at 2:40-49.)  A.H. told police that she had been paid to give the suspect rides, which had started 2-3 weeks earlier.  (Gov't Ex. 3 at 3:10-31.)  Officer Peterson indicated to A.H. that Young was a bad actor and had done some bad things to her, which was an attempt to try to gain her favor to speak to him.  (R. 44.)  During the recording of their conversation, A.H. asked how the police knew about Young, and Officer Peterson told her that "he is a pretty big offender."  (Gov't Ex. 3 at 6:20-36.)  She then asked if she was going to get in trouble for "reporting this," to which Officer Peterson replied that she was "all good for reporting it" and that it was Young who was in trouble and in jail for having a gun because he could not have one legally and for having a couple of felony warrants. (*Id.* at 6:38-52.)  A.H. then proceeded to provide an account of what occurred with Young.  (*See id.*)  A.H. noted that she waited for three hours to report the incident to police because she was afraid of the police and Officer Peterson said he understood that fear.  (*Id.* at 17:27-18:00.)

Approximately twenty minutes into the interview, Officer Peterson told A.H. that based on what she had told him, he believed there was enough evidence to charge Young with terroristic threats, which is a felony, and asked her if she wanted to press charges since she was the victim of the crime, given what he had put her through.  (Gov't Ex. 3 at

20:00-30.)  Officer Peterson also explained that he had a number of other charges that were likely going to be brought against him, including having a firearm and warrants for a probation violation.  (*Id.* at 20:30-50.)  A.H. asked if her pressing charges would make it worse for Young, and Officer Peterson told her that he would be charged with more crimes.  (*Id.* at 20:44-53.)  A.H. asked Officer Peterson if he thought she should press charges, and he told her that he could not tell her what she should do, but he would press charges if he was the victim, but that it was entirely her decision, and he could not force her to press charges.  (*Id.* at 20:53-21:07.)  He noted that because Young's conduct with A.H. was in the report, Young could be charged regardless, but that if she wanted to, it would increase the likelihood of him being charged if she was cooperative.  (*Id.* at 21:07-15.)  She responded that she did not want to be involved, and that she would think about it.  (*Id.* at 21:26-50.)  A.H. asked if this situation would affect a matter that she had in court regarding a "phone violation" and Officer Peterson responded that this situation had nothing to do with that matter.  (*Id.* at 22:01-20.)

Officer Peterson then asked A.H. if she was aware that she had narcotics in her vehicle, she said she was not aware, and he recommended that A.H. go through the vehicle to see if there were any other narcotics in the vehicle that police did not find.  (*Id.* at 22:32-23:50.)  A.H. admitted that she did smoke a little weed, but that if any was found it was not hers at that time.  (*Id.* at 23:50-24:06.)  She said there could be marijuana shavings, but that is not what police had found according to Officer Peterson.  (*Id.* at 24:01-04.)  Officer Peterson asked her if she kept crack cocaine in her vehicle, which had been found and left by Young, and that if they had not located it and she was stopped she

could have been charged with a felony because of Young.  (*Id.* at 24:06-24:40.)  A.H. stated that made her want to press charges, to which Officer Peterson replied, "well he's done quite a lot to you, he is not a very good guy." (*Id.* at 24:40-47.)  A.H. then asked if Officer Peterson wanted anything else from her and he proceeded to collect biographical information from A.H.  (*Id.* at 24:47-50.)  Officer Peterson then asked if she had any questions and she asked if he wanted to take the bag of Young's clothes that were in her vehicle, which he obtained and concluded the interview with A.H.  (*Id.* at 24:50-26:11.)

The vehicle was ultimately returned to A.H. and she left with the vehicle.  (R. 43-44; Gov't Ex. 3 at 27:00-27:08.)

### III.    MOTION TO REQUIRE INSPECTION OF CELLPHONES (Dkt. 19)

Young moves the Court to enter an order requiring the Government to permit defense counsel to inspect a cellphone, which is presently in the Government's custody pursuant to a search warrant issued by this Court.[1]  (Dkt. 19 at 1.)  The Government has not been able to access the cellphone's data because it is encrypted.  (*Id.* at 2.)  Young does not propose or agree that the Government could access the cellphone as part of his proposed inspection and declined to provide the necessary passcode.  (Dkt. 21 at 11.) Young seeks relief pursuant to Rule 16(a)(1)(E) of the Federal Rules of Criminal

---

[1]    The Government originally stated that it was unable to extract data from any of the three cellular devices seized from Young (Dkt. 21 at 11), but clarified in its post-hearing brief that the Government has extracted data from two other cellular devices seized from Young and produced those extractions to Young's attorney (Dkt. 46 at 13-14).  To the extent that Defendant does not believe that he has received a full extraction, or otherwise wishes to inspect the exterior of any of the devices in the presence of the Government, he is free to renew his motion.

Procedure, as well as *Brady v. Maryland,* 373 U.S. 83 (1963) and its progeny.  (Dkt. 19 at 1.)

The Government opposes this Motion on the ground that the data on the cellphone is encrypted and thus not within Government custody or control.  (Dkt. 21 at 12.)  The Government also challenges the request for relief under Rule 16 on the basis that Young has not set forth with any specificity what information on the devices are material to his defense.  (*Id.* at 11-12.)  In its post-hearing brief, the Government continues to argue that "Young has not met his burden to show any entitlement to relief under Rule 16, *Brady*, or otherwise."  (Dkt. 46 at 14.)

Rule 16(a)(1)(E) provides: "the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control."  Fed. R. Crim. P. 16(a)(1)(E).  While the physical cellphone is the Government's possession by virtue of a warrant, the data it contains is not in the Government's possession because the cellphone is encrypted, Young has refused to provide his passcode, and the Government has not been able to break the encryption.  Consequently, the data on the cellphone do not fall within the scope of Rule 16(a)(1)(E).  Similarly, there is no obligation under *Brady* requiring the Government to discover information not in its possession.  *See United States v. Jones*, 34 F.3d 596, 599 (8th Cir. 1994) ("*Brady* requires the prosecution to disclose to the defendant only evidence in the prosecution's possession.");  *see also United States v. Case*, No. 1:19-CR-00360-BLW-2, 2020 WL 4227554, at *3 (D. Idaho July 23, 2020),

*aff'd*, 851 F. App'x 105 (9th Cir. 2021) ("Second, the Government was not obligated to disclose the FBI's possession of the cellphone or produce its contents to the defense. Because the phone was password-protected, the Government did not have access to the records the Defendant seeks. The Government could not suppress evidence they did not have access to.") (citations omitted).

In addition, Rule 16 only requires the Government to produce information "material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E)(i). Evidence is material for the purposes of Rule 16 if it is "helpful to the defense." *United States v. Vue,* 13 F.3d 1206, 1208 (8th Cir. 1994) (citations omitted). Young bears the burden of showing materiality under Rule 16. *See United States v. Jean,* 891 F.3d 712, 715 (8th Cir. 2018). "A showing of materiality . . ., is not satisfied by a mere conclusory allegation that the requested information is material to the preparation of the defense." *United States v. Krauth*, 769 F.2d 473, 476 (8th Cir. 1985) (marks and citation omitted) (addressing predecessor Rule 16(a)(1)(C)) (citation omitted). Here, Young has argued only that the phone "contains information material to Mr. Young's defense—namely, videos and other photographs and text messages—that the defense needs to adequately prepare for trial." (Dkt. 19 at 1-2.) At the hearing, Young's counsel represented that "[w]e're just asking to inspect it to look for materials that may be exculpatory and material to our potential

defense."[2]  (R. 51.)  These threadbare conclusory assertions of materiality do not meet the requirements of Rule 16.

Finally, the Court notes that Young originally argued: "The defense does not seek to permanently remove Mr. Young's iPhone from the government's custody; instead, the defense seeks only to inspect the phone and make copies of the evidence it contains that is material to preparing the defense."  (Dkt. 19 at 2.)  But presumably Young's counsel does not intend to leave the cellphone in an unlocked state after the inspection and copying; otherwise, counsel would have agreed to a mutual inspection of the cellphone. Young cites no authority for the proposition that a defendant in a criminal case may not only unlock a device the Government has been unable to decrypt for inspection and copying, but then lock it back up when complete—even though there is a warrant authorizing a search of the device.  The Court declines to permit Young's inspection of the cellphone on such terms.

For these reasons, the Motion is denied.

### IV.     MOTION TO SUPRESS THIRD-PARTY STATEMENTS (Dkt. 17)

Young seeks an order suppressing all statements obtained by the Rochester Police Department from A.H. regarding his alleged possession of a firearm on or about March 19, 2023.  (Dkt. 17 at 1.)  Young argues that if the Government were permitted to use A.H.'s statements at trial, his due process rights under the Fifth Amendment would be

---

[2]     The Court also notes *Brady* does not give Young the right to inspection as "*Brady* is not a discovery rule, but a rule of fairness and minimum prosecutorial obligation." *Krauth*, 769 F.2d at 476.

violated.  (*Id.*)  According to Young, A.H.'s statements are the product of police coercion and are therefore unreliable.  (Dkt. 17 at 1, 3-5; Dkt. 23 at 3-4.)

A defendant may seek to suppress his own involuntary statements based on his Fifth Amendment right against self-incrimination.  *See Mincey v. Arizona*, 437 U.S. 385, 398 (1978).  With respect to the statements of others to law enforcement, Young has no standing to argue suppression to vindicate A.H.'s rights, but he may argue that the admission of her statements at trial would violate his due process right to a fair trial.  *See United States v. Hous*e, 825 F.3d 381, 388 (8th Cir. 2016) ("Although House does not have standing to vindicate Stitt's right against self-incrimination, he has standing to raise a Fifth Amendment claim to protect his own right to a fair trial.") (citing *United States v. Dowell*, 430 F.3d 1100, 1107 (10th Cir. 2005) (citation omitted)).  The test for exclusion as set forth by the Eighth Circuit in *House* is as follows:

> Where a defendant seeks to exclude witness testimony because it is a result of a coerced confession, **he has the burden to prove** that the earlier confession was coerced **and** led to false trial testimony.

825 F.3d at 388 (citing *Dowell*, 430 F.3d at 1107) (emphasis added); *see also United States v. Paris*, 954 F.3d 1069, 1072 (8th Cir. 2020) ("In this case, by contrast, Paris cannot show how the constitutional violation that Woods allegedly suffered specifically affected his right to a fair trial.  Nor is there any evidence that Woods's statements to the government were anything other than voluntary and truthful.").

The standard for voluntariness remains the same whether a defendant seeks to suppress his own coerced statements or exclude the statements of others.  *See Paris*, 954

F.3d at 1072 (citing *United States v. LeBrun*, 363 F.3d 715, 725-26 (8th Cir. 2004)).

According to the Eight Circuit in *LeBrun*:

> "A statement is involuntary when it was extracted by threats, violence, or express or implied promises **sufficient to overbear the defendant's will and critically impair his capacity for self-determination**." *Simmons v. Bowersox*, 235 F.3d 1124, 1132 (8th Cir.), *cert. denied*, 534 U.S. 924 (2001).

363 F.3d at 724 (emphasis added); *see also Dowell*, 430 F.3d at 1108 (citation omitted) ("Considering the totality of the circumstances in this case, therefore, the evidence before the district court was insufficient to create a 'serious factual dispute' as to whether Sherman's will was overborne and his confession involuntary. In light of that, the trial court did not err in failing to conduct an evidentiary hearing.").

Here, Young has not met his burden to demonstrate any facts supporting the assertion that A.H.'s statements were coerced by law enforcement.  Young argues coercion on the basis that: Officer Peterson told A.H. she was not initially in trouble nor in trouble for reporting Young; used leading questions; continued to press her to make additional allegations against Young; asked her to provide additional allegations against Young, after telling her that narcotics were found in the vehicle; calling Young a pretty big offender, and attempted to convince A.H. to bring charges against Young by telling her that she was a victim and that: "He's done quite a lot to you.  He's not a very good guy." (Dkt. 17 at 3-5.)  While Plaintiff questioned her own judgment, as asserted by Young (*id.* at 4), she made the comment with respect to her hanging out with Young, not to indicate that she was impaired in any way (Gov't. Ex. 3 at 6:50-54).  Young has provided no evidence of A.H.'s impairment.  Moreover, any assertions that Officer

Peterson used leading questions or prodded A.H. to provide information, even taken together, are insufficient to support a finding of coercion. *See Mann v. Thalacker*, 246 F.3d 1092, 1100 (8th Cir. 2001) (finding confession was not coerced where defendant was interrogated on little sleep by an officer who used some leading questions and sometimes prodded defendant to be more forthcoming). Further, Young did not provide evidence Officer Peterson's representations that A.H. was not in trouble were untruthful, and there were no promises of leniency, which in any event do not render a statement involuntary per se. *See Simmons v. Bowersox*, 235 F.3d 1124, 1133 (8th Cir. 2001) (citations omitted) ("Although a promise made by law enforcement is a relevant consideration in assessing police conduct, it is only one circumstance to be considered and does not render a confession involuntary per se.").

Young's arguments ignore that it was A.H. who initiated contact with law enforcement and yet she refused to seek further charges for terroristic threats against Young at the time of her statement, even though Officer Peterson asked her if she wanted to do so, and even after A.H. learned that Young had left narcotics in her vehicle. This hardly supports a conclusion that A.H.'s will was overborne or her statements coerced. In other words, based on the totality of the circumstances, the Court finds that Young has not met his burden to show that the conduct of Officer Peterson resulted in A.H.'s will being overborne so as to warrant a further hearing with respect to any coercion, let alone an order for suppression of A.H.'s statements to police.

For these reasons, the motion to suppress the statements of A.H. on due process grounds should be denied. That said, nothing in this Report and Recommendation should

be interpreted as prohibiting Young from examining A.H. at trial regarding her statements to law enforcement, within the confines of the rules of evidence and the rulings of the Court, to the extent that A.H. is called as a witness at trial.

## V.     MOTION TO SUPPRESS EVIDENCE (Dkt. 18)

Young contends that the results of the seizure and search of the red Subaru on March 19, 2023 violated the Fourth Amendment, as his warrantless arrest lacked a sufficient basis.  (Dkt. 45 at 3.)  Young argues that A.H. never indicated any criminal wrongdoing on the part of Young before his arrest, including that he was prohibited from legally possessing a firearm, or that he had used the firearm in a threatening manner or verbalized anything constituting a threat to commit a crime in violation of Minn. Stat. § 609.713, subd. 1.  (Dkt. 45 at 3-4.)  Young also claims that he has standing to challenge the search of the Subaru, even as a passenger, because he was ordered out of the vehicle. (*Id.* at 4-5.)

## A.     Young's Standing to Challenge the Search of the Subaru

Young does not claim ownership of the Subaru and concedes that he was a passenger in the vehicle.  (Dkt. 45 at 5.)  Absent an ownership interest in a vehicle, "the defendant must present at least some evidence of consent or permission from the lawful owner/renter to give rise to an objectively reasonable expectation of privacy." *United States v. Muhammad,* 58 F.3d 353, 355 (8th Cir. 1995) (citations omitted) (no legitimate expectation of privacy where defendant presented no direct evidence that he had consent or permission to use the automobile).  Moreover, Young acknowledges that the Supreme Court and the Eighth Circuit have held that a mere passenger lacks standing to make a

16

Fourth Amendment challenge to a search-seizure of that vehicle.  (Dkt. 45 at 4 (citing *United States v. Durant*, 730 F.2d 1180, 1182 (8th Cir. 1984), citing *Rakas v. Illinois*, 439 U.S. 128, 148 (1978)).  This would seem to end the question of standing.  However, Young argues that the *Durant* decision gives him standing because he was ordered out of the vehicle.  (Dkt. 45 at 4-5.)  In *Durant*, the Eighth Circuit held as follows:

> *Rakas* holds that a mere passenger in an automobile ordinarily does not have the legitimate expectation of privacy necessary to challenge the search of that automobile. This case is distinguishable, however, because Farris was ordered out of the car and frisked. In fact, it was the roll of money found on her person that led to the search of the automobile. Farris can contest the legality of the stop and frisk. Any evidence attained as a direct result of an illegal stop would be inadmissible under the "fruit of the poisonous tree doctrine"

*Durant*, 730 F.2d at 1182.

The facts here are distinguishable from those in *Durant* on the basis that the defendant in that case was a passenger in the car stopped by police, whereas here Young presented no direct evidence that he had any legitimate basis for being in the car, and therefore was not a passenger.  Indeed, the evidence before the Court is that A.H. told police before his arrest that she had refused to give Young a ride to the cities, he would not leave A.H.'s Subaru, she observed Young with a gun, Young asked her what if he shot her in the head, Young threatened to blow something up in her Subaru, and that A.H. ultimately left her Subaru with her keys out of fear.  The undisputed evidence is that Young was not a passenger at the time of the search and seizure; in fact, he lost his passenger status when A.H. asked that he leave her Subaru and, when he did not do so, A.H. was forced to abandon her Subaru.  Young had no lawful basis in being in A.H.'s

Subaru at the time of his arrest so as to give him any standing with respect to the search of the vehicle. *See United States v. Muhammad*, 58 F.3d 353, 355 (8th Cir. 1995) (holding a defendant "must present at least some evidence of consent or permission from the lawful owner/renter to give rise to an objectively reasonable expectation of privacy") (citations omitted); *see also United States v. Quiroz,* 57 F. Supp. 2d 805, 820 (D. Minn. 1999) ("In this case, Defendant has established at least a possessory interest in the maroon Oldsmobile, as Police observed Defendant driving the vehicle throughout much of the day.  However, Defendant presented no direct evidence that he had any legitimate basis for being in the car.  In the absence of such evidence, we conclude that Defendant failed to show a reasonable expectation of privacy in the maroon Oldsmobile, and should be prohibited from challenging the legality of its search."), *aff'd sub nom. United States v. Vasquez*, 213 F.3d 425 (8th Cir. 2000).

The Motion to Suppress should be denied because Young does not have standing to challenge the search of the Red Subaru.

**B.     Warrantless Arrest**

As stated previously, Young argues that the result of the search of A.H.'s vehicle was the fruit of his illegal arrest.  (Dkt. 45 at 3, 5.)  Even assuming that Young has standing to challenge the search of the Subaru, the Court finds that the Motion to Suppress should be denied.  As the Government concedes (Dkt. 46 at 11), the Court will assume for purposes of argument that probable cause was required for Young's seizure, given that the officer calling out commands over the loudspeaker told Young that he was "under arrest."

Young argues that his warrantless arrest violated the Fourth Amendment, as A.H. did not indicate any unlawful conduct by him, and because officers lacked sufficient information as to his identity prior to his arrest, as Officer Peterson's "hunch" that the suspect in the Subaru was Young was insufficient for the purposes of probable cause. (Dkt. 45 at 3-4.)

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "A warrantless arrest violates the Fourth Amendment unless it is supported by probable cause." *Webster v. Westlake*, 41 F.4th 1004, 1010 (8th Cir. 2022). "An officer has probable cause to make a warrantless arrest when the facts and circumstances are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense." *Royster v. Nichols*, 698 F.3d 681, 688 (8th Cir. 2012) (marks and citation omitted). In making this determination, "we look at the totality of the circumstances as set forth in the information available to the officer at the time of arrest." *Id.* (marks and citation omitted) (cleaned up). "As probable cause is determined at the moment the arrest was made, any later-developed facts are irrelevant to the probable cause analysis for an arrest." *Id.* (cleaned up).

In evaluating whether probable cause existed from the totality of the circumstances, the Court is required to give law enforcement "substantial latitude in interpreting and drawing inferences from factual circumstances." *Id.* (marks and citation omitted). Generally, an officer is "entitled to rely on the veracity of information supplied by the victim of a crime" and "an officer need not conduct a 'mini-trial' before

effectuating an arrest although he cannot avoid 'minimal further investigation' if it would have exonerated the suspect." *Id.* (marks and citations omitted). "Because probable cause deals with probabilities and depends on the totality of the circumstances, it is a fluid concept that is not readily, or even usefully, reduced to a neat set of legal rules. . . . Probable cause is not a high bar." *D.C. v. Wesby*, 583 U.S. 48, 56-57 (2018) (internal marks and citations omitted).

Here, prior to ordering Young out of the vehicle, officers had information from A.H. that she had picked up a male a few hours earlier that she did not really know, who had asked her for a ride to the cities in exchange for money, but that it was getting late and when she told him that she did not want to give him a ride to the cities, the man became more aggressive; that he had a gun on his person and would not leave her car; that she had to leave her car with the keys; and that she did not know if the person was still in her vehicle. (Gov't Ex. 4 at 00:00-7:50; *see also* R. 44-45.) She also provided an estimated location of the vehicle with a description of the vehicle as a red Subaru Legacy. (Gov't Ex. 4 at 4:58-5:50, 6:50-7:00.)

The dispatcher had the identity of the reporting party and her telephone number, making it easy for law enforcement to hold her accountable for false reporting and making it reasonable for law enforcement to give weight and credibility to her information. *See United States v. LaGrange*, 981 F.3d 1119, 1122 (8th Cir. 2020) (finding that law enforcement is entitled to give a non-anonymous informant's tip greater weight because police can hold the informant accountable for any false information) (citing *United States v. Kent*, 531 F.3d 642, 648 (8th Cir. 2008)). Moreover, the

discovery by law enforcement of the red Subaru in the approximate area described by A.H., who also provided a direct observation of Young, helped establish her reliability for probable cause purposes. *See United States v. Taylor*, 106 F.3d 801, 803 (8th Cir. 1997) (finding that when assessing the informant's trustworthiness, a court looks for "some independent verification" that the information was reliable, and that "this confirmation can consist of verifying details that would not, standing alone, lead police to suspect a crime") (cleaned up).

Regardless, the police did not arrest Young at this point, but instead contacted A.H. again after they found the Subaru. A.H. then revealed that the man in her Subaru used the SnapChat name of "Tay Wild." Officer Peterson used this information to search the local police database that only yielded one match to that nickname, that of Divante Young, who had an outstanding felony arrest warrant. While Officer Peterson was looking at photographs of potential matches on his computer database, A.H. described the man in her car as a shorter black male and confirmed that he had dreadlocks. (Gov't Ex. 1 at 4:38-5:29; R. 34.) Officer Peterson testified that the information provided by A.H. was consistent with what he was seeing on the law enforcement database for Young. (R. 16.) Officer Peterson told A.H. that he might know who she was talking about based on his access to the police database. (Gov't Ex. 1 at 5:26-33.) Officer Peterson testified that at that time he was "fairly certain" that the person in the vehicle was Young. (R. 34.) Given the totality of the circumstances prior to the arrest, including the information A.H. provided, and Officer Peterson's investigation, which matched A.H.'s reference to the "Tay Wild" nickname and description of the man in her vehicle with the police

21

database's record of Young's nickname and physical characteristics, as well as the record of Young's outstanding felony warrant, was sufficient to lead a reasonable person to believe there was a fair probability that the suspect in the Subaru had committed a crime, that is, a violation of Minn. Stat § 609.713 , so as to warrant his seizure.  Contrary to any assertion by Young, probable cause did not require absolute certainty regarding his identity prior to his arrest.  *See Walz v. Randall*, 2 F.4th 1091, 1100 (8th Cir. 2021) ("Officers are not required to have collected enough evidence so as to justify a conviction for there to be a legitimate finding of probable cause to justify a warrantless arrest. Rather, probable cause requires that the officers involved in an arrest are aware of facts establishing a fair probability that the person being arrested has committed a criminal offense.") (cleaned up).

* * *

For all of the reasons stated above, Young's Motion to Suppress should be dismissed.

## VI.    MOTION TO DISMISS (Dkt. 35)

Young argues that 18 U.S.C. § 922(g)(1) is unconstitutional facially and as applied to him in violation of the Second Amendment in light of the United States Supreme Court's decision in *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). (Dkts. 35 at 1.)  The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear arms shall not be infringed."  U.S. Const. amend. II.  The *Bruen* Court adopted the following test for determining whether a government regulation of firearms is permissible:

22

> [W]e hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

142 S. Ct. at 2126 (footnote omitted) (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

Young argues that merely having a felony record, however, was never among the reasonable, well-defined bases permitting the disarming of persons in this country's historical tradition of regulating firearms. (Dkt. 35 at 3-7.) The Eighth Circuit in *United States v. Jackson*, 69 F.4th 495 (8th Cir. 2023), addressed similar arguments post-*Bruen*, finding that "legislatures traditionally employed status-based restrictions to disqualify categories of persons from possessing firearms," and concluding that "Congress acted within the historical tradition when it enacted § 922(g)(1) and the prohibition on possession of firearms by felons." *Id.* at 505. For this reason, the Eighth Circuit affirmed the denial of a motion to dismiss an indictment based on the argument that § 922(g)(1) was unconstitutional as applied to the defendant "because his drug offenses were 'non-violent' and do not show that he is more dangerous than the typical law-abiding citizen." *Id.* at 501-05. The Eighth Circuit has denied a petition for *en banc* rehearing and for panel rehearing of *Jackson*. *See United States v. Jackson*, No. 22-2870, 2023 WL 5605618, at *1 (8th Cir. Aug. 30, 2023). The Eighth Circuit has also rejected a defendant's as-applied challenge asserting entitlement to possess a firearm under the

Second Amendment notwithstanding his past felony convictions because neither of his felonies qualified as "violent," finding it "foreclosed" by *Jackson*. *United States v. Cunningham*, 70 F.4th 502, 506 (8th Cir. 2023).

The Court acknowledges, as argued by Young, that courts outside of the Eighth Circuit have narrowed the reach of § 922(g) to exclude non-violent felons or otherwise found § 922(g)(1) unconstitutional as applied.[3]  *See*, *e.g.*, *Range v. Att'y Gen.*, 69 F.4th 96 (3d Cir. 2023) (en banc) (finding § 922(g)(1) unconstitutional as applied to non-violent felons); *United States v. Rahimi*, 61 F.4th 443, 460–61 (5th Cir. 2023) (finding § 922(g)(8) unconstitutional).  However, this "District Court . . . is bound . . . to apply the precedent of this Circuit."  *Hood v. United States*, 342 F.3d 861, 864 (8th Cir. 2003) (citation omitted).  Both *Jackson* and *Cunningham* were decided post-*Bruen* and are dispositive of Young's challenge to the constitutionality of § 922(g)(1).  Indeed, Young concedes that this Court is bound by *Jackson*.  (Dkt. 35 at 1.)  For these reasons, based on current Eighth Circuit precedent, the Court recommends denial of Young's Second Amendment-based Motion to Dismiss.

## VII.   ORDER

Based on the files, records, and proceedings herein, **IT IS ORDERED THAT:** Defendant Divaunte Kartrell Young's Motion to Require Government to Permit Defense Inspection of Defendant's Cellphone (Dkt. 19) is **DENIED.**

---

[3]      The Court notes that Young is not arguing that his previous convictions were non-violent in nature.

## VIII.  RECOMMENDATION

Based on the files, records, and proceedings herein, **IT IS RECOMMENDED THAT:**

1.      Defendant Divaunte Kartrell Young's Motion to Suppress Witness Statements Pursuant to the Fifth Amendment (Dkt. 17) be **DENIED**;

2.      Defendant Divaunte Kartrell Young's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Dkt. 18) be **DENIED**;

3.      Defendant Divaunte Kartrell Young's Motion to Dismiss the Indictment (Dkt. 35) be **DENIED**;

4.      Defendant Divaunte Kartrell Young's Pro Se Motion for Judgement of Acquittal (Dkt. 48) be **DENIED**;

5.      Defendant Divaunte Kartrell Young's Pro Se Motion to Release Property (Dkt. 50) be **DENIED**; and

6.      Defendant Divaunte Kartrell Young's Pro Se Requests to the Court from the Defense (Dkts. 52, 53, 54) be **DENIED**.


Dated:          March 4, 2024                    *s/Elizabeth Cowan Wright*
                                                 ELIZABETH COWAN WRIGHT
                                                 United States Magistrate Judge

## **NOTICE**

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c).